IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 20, 2019 Session

## STATE OF TENNESSEE v. BRANDON E. BANKS

**Appeal from the Criminal Court for Davidson County**
**No. 2015-C-1517    Monte Watkins, Judge**

_____

**No. M2018-00264-CCA-R3-CD**

_____

A Davidson County grand jury indicted the defendant, Brandon E. Banks, for five counts of aggravated rape and two counts of aggravated sexual battery.  After trial, a jury convicted the defendant of one count of each offense.  On appeal, the defendant challenges the trial court's denial of his motion to suppress evidence obtained from a warrantless search of his cell phone, the sufficiency of the evidence supporting his conviction for aggravated rape, and several of the trial court's evidentiary rulings.  After a thorough review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which TIMOTHY L. EASTER, J., joined.  NORMA MCGEE OGLE, J., filed a separate opinion concurring in part and dissenting in part.

Mark Scruggs, Katie Hagan, Richard McGee, and Kevin McGee, Nashville, Tennessee, for the appellant, Brandon Eric Banks.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Roger Moore and Jan Norman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

In the early morning hours of June 23, 2013, the defendant participated in the thirty-two-minute sexual assault of the victim as she lay unconscious on the floor of a dormitory room on the campus of Vanderbilt University. A Davidson County grand jury indicted the defendant and his three co-defendants, Brandon Vandenburg, Corey Batey, and JaBorian McKenzie, for five counts of aggravated rape (counts 1-5) and two counts of aggravated sexual battery (counts 6 and 7).[1] The trial court granted severance to the defendant on October 16, 2013, and subsequently addressed numerous pre-trial motions before trial began on June 19, 2017.

I.      *Motion to Suppress*

The defendant filed a motion to suppress "all images and media contained on his cell phone." According to the defendant, officers seized his cell phone on June 27, 2013, after an initial interview. The following day, officers executed a search warrant for electronic devices found in the defendant's dorm room or on his person. Because the cell phone was not in either location during the search, the defendant argued the search warrant was inapplicable to the same. The defendant presented the following evidence supporting his position at a suppression hearing.

On June 27, 2013, Detective Jason Mayo of the Metropolitan Nashville Police Department ("MNPD") interviewed the defendant regarding his participation in the crimes committed against the victim. Detective Mayo told the defendant he was not under arrest and that he could leave the interview at any time. The defendant detailed a version of events with which Detective Mayo disagreed based upon his review of surveillance footage and a prior interview with Vandenburg, during which he learned the crimes were videoed and distributed. At the conclusion of the interview, the defendant refused to provide a DNA sample. Detective Mayo told the defendant he was no longer free to leave and stated he would obtain a search warrant in order to gather a DNA sample. The defendant reconsidered, signed a consent form, and provided the sample. Additionally, Detective Mayo seized the defendant's cell phone, an Apple iPhone 4S with serial number DNPGQ4BCD2C1. The defendant did not provide consent to search the phone.

The following day, June 28, 2013, Detective Mayo executed numerous search warrants against the defendant and his co-defendants. One such warrant permitted the search and seizure of the defendant's electronic devices found either on his person or in his dorm room, Room 614 of Gillette Hall located on the campus of Vanderbilt

_____

[1]As to the defendant, several counts of the indictment were based on a theory of criminal responsibility. Additionally, in the original indictment, Vandenburg was charged with unlawful photography (count 8).

University. The search rendered the following items: "HP laptop s/n: CNF0461WL2; Samsung Laptop s/n HPX791KC300675A; flip video camera; Microsoft thumb drive; DVD (10); 4GB thumb drive." A copy of the search warrant was entered into evidence.

At the suppression hearing, Detective Mayo testified the search warrant did not actually cover the defendant's cell phone as it was not in the defendant's dorm room or on his person during the execution of the warrant. However, at the time of the execution of the warrant, Detective Mayo believed it did authorize a search of the defendant's cell phone. Therefore, Detective Mayo asked the defendant for the "[passcode] for his phone" in order to "open it and search it." He did not specifically discuss consent to search the cell phone with the defendant.

As the investigation progressed, the defendant hired counsel with whom Detective Mayo began communicating. He described one conversation with the defendant's former counsel,[2] as follows:

> I spoke to [former counsel] and told him that the phone that his client had provided did not work. I asked him . . . The [passcode] to the phone did not work. I asked him if he would reach back out to [the defendant] and get the correct pass code. We then spoke again, and I believe he gave me two different [passcodes]. He said somewhere, somewhat of the conversation was he said, referring to [the defendant], it's one of these two codes, and gave me those two [passcodes].

According to Detective Mayo, former counsel "knew that there was a search warrant" for the defendant's cell phone when he requested the passcode for the same. Detective Mayo believed the request for the passcode operated as an indirect discussion of the defendant's consent to search the phone as it was understood the passcode would be used "to unlock that specific phone."

Detective Mayo, however, "never did obtain the correct [passcode]." He explained one of the provided passcodes "was tried and did not work, and there was a fear that if you enter too many wrong codes too many times into a phone, it will completely lock. So, after the first code was attempted and failed, I don't believe the second code was attempted." Instead, Detective Chad Gish, who was also investigating the case, bypassed the passcode security feature and searched the defendant's cell phone through other means.

---

[2]The defendant hired different counsel for trial; as such, we will refer to the defendant's initial counsel as "former counsel."

Former counsel also testified, stating the defendant retained him in July of 2013 before formal charges were filed but after detectives conducted an initial interview with the defendant, obtained a DNA sample from the defendant, and executed a search warrant against the defendant. He "distinctly remember[ed]" the conversation regarding Detective Mayo's request for the passcode to the defendant's cell phone. According to former counsel, Detective Mayo called him requesting the passcode to the cell phone because "he'd had trouble getting into [the defendant's] phone." Former counsel "specifically" recalled Detective Mayo stating he had "a search warrant for the phone" but he "just need[ed] the codes." Former counsel contacted the defendant and subsequently provided two passcodes to Detective Mayo. Former counsel explained, "[h]ad [Detective Mayo] not told me that there was a search warrant for the phone, I wouldn't have given him the numbers." Former counsel did not know if the passcodes provided actually unlocked the defendant's cell phone.

At the conclusion of the proof, the defendant entered into evidence a stipulation from Detective Gish's reports establishing that the passcodes provided did not unlock the defendant's cell phone. After its review, the trial court denied the defendant's motion to suppress the evidence obtained from the search of his cell phone. The defendant then proceeded to trial.

II.    *Trial*

The evidence produced at trial showed at 2:38 a.m. on June 23, 2013, the defendant, Vandenburg, Batey, and McKenzie entered Room 213 of Gillette Hall with the unconscious victim. For the next thirty-two minutes, the four men committed numerous sexual crimes against the victim. The State presented forty-two thumbnail images and three videos depicting the defendants' sexual crimes. The images, which were recovered from numerous cell phones and computers, explicitly show the defendant's participation in the sexual abuse of the victim. One thumbnail image shows the defendant touching the victim's vagina. In a separate video, the defendant is seen squeezing a water bottle that has been inserted into the victim's anus.

Prior to entering Room 213, the victim and Vandenburg were seen together at Tin Roof, a bar in Nashville, Tennessee, by the victim's friends, Lauren Miller and Julianna Martel. At the bar, Ms. Miller described Vandenburg as "extremely excited to see the victim, and [he] immediately came up to her and handed her a drink and just seemed like very energetic and enthusiastic." At approximately 1:30 a.m., Ms. Martel saw the victim holding "a blue drink." She did not "notice anything out of the ordinary," stating the victim seemed "[c]ompletely normal." Less than an hour later, however, surveillance footage captured Vandenburg carrying the unconscious victim towards Gillette Hall along with Batey, McKenzie, and the defendant. This surveillance footage prompted an

investigation by Captain Donnie Harville of the Vanderbilt University Police Department ("VUPD").

Initially, the Vanderbilt University Housing Authority informed Captain Harville that "four individuals" were seen "carrying an unconscious female" into Gillette Hall on June 23, 2013. Captain Harville reviewed surveillance footage from Gillette Hall and saw "four individuals, who we identified later as students, carrying an unconscious female into the dorm rooms." The Associate Dean of Students of Vanderbilt University, Gerald Black, aided in identifying the students seen on the surveillance footage. At the time, Mr. Black served as an assistant dean and director of student contact for Vanderbilt University. On Monday, June 24, 2013, he received an email from the Housing and Residential Education Office containing "several video clips" depicting "four males carrying a woman in one of [the] residence halls on campus." According to Mr. Black, the Access and Security Team pulled additional surveillance footage in an effort to identify the four males and the woman seen in the video clips. Once the team determined "a few of the parties" were student athletes, Mr. Black met with representatives from the Department of Athletics, who identified nine students as seen on the surveillance footage: Chris Boyd, Dillon Van der Wal, Jacob Bernstein, Deandre Woods, Mack Prioleau, Brandon Vandenburg, Corey Batey, JaBorian McKenzie, and the defendant. The victim was not initially identified.

On June 25, 2013, Mr. Black and his staff conducted recorded, "preliminary meetings" with the nine students who "came over together as a group after they . . . concluded their athletic activities for the afternoon." Mr. Black prefaced the meetings by stating "there were some concerns raised about the evening of the 22nd, into the morning hours of the 23rd, and that [they] wanted to ask them some questions about their whereabouts and what they might know about other students' whereabouts and things like that."

Regarding the evening in question, the defendant told Mr. Black he saw Vandenburg drive in front of Gillette Hall with the victim as he returned to the dormitory after picking up food. The victim was "slumped over" in the car and looked sick. The defendant did not know if the victim's sickness was alcohol-related and admitted he did not consider getting medical help for her. The defendant, Batey, and McKenzie helped Vandenburg take the victim to Vandenburg's dorm room, noting she threw up in the elevator on the way. Once inside the room, they placed the victim on the floor, the defendant put a towel by her mouth, and she appeared to go to sleep. The defendant, Vandenburg, Batey, and McKenzie remained in the room and were "basically chillin' and stuff like that." At one point, Vandenburg "chucked" water on the defendant's shirt so the defendant took it off. The defendant stated Mr. Prioleau, Vandenburg's roommate,

who was also asleep in the room, woke up and asked what the group was doing. They responded, "[n]othing, but chillin,'" and Mr. Prioleau went back to sleep.

The defendant denied taking pictures or videos of the victim and denied physically touching her with his hands, mouth, or genitals. The defendant further stated no one in the room touched the victim inappropriately, moved her clothing to expose her genitals, had any type of intercourse with her, or took pictures or videos of her. The defendant denied seeing images or videos of Batey or McKenzie having sex with the victim but remembered Vandenburg covering the camera in the hallway with a towel. The defendant stated he left the room after he refused to move the victim from it. The defendant also prepared a written statement reflecting the same.

Over the next several weeks, Captain Harville continued to compile relevant surveillance footage from across the Vanderbilt University campus, which he downloaded from the NICE video system,[3] placed into evidence, and provided to the MNPD. Captain Harville stated, "once we saw the video of them carrying an unconscious female into that room and then coming out of that room, what we did is we contacted Metro Police Sex Crimes Unit and asked them to come in and take over the investigation." In response, on June 26, 2013, Detective Mayo met with Captain Harville and viewed "a few still images from surveillance video printed out on just pieces of paper." The images showed "several young men that were carrying a female who, at that time . . . appeared to be unconscious or incapacitated in some way through a hallway." Detective Mayo spoke with the victim, who identified herself in four or five still images but was unable to provide specific details about what occurred in the room. She did, however, provide Detective Mayo with the clothing she wore on June 23, 2013, including a skirt, a shirt, two pairs of underwear, and a bra, all of which were entered into evidence at trial.

Despite not knowing if a sexual assault occurred, Detective Mayo asked the victim to "consent to having a medical legal exam, sexual assault evidence collection kit completed." The victim agreed and submitted to the exam at the emergency department of the Vanderbilt University Medical Center. Detective Mayo waited in the emergency room until the examination was completed. He collected the rape kit and turned it into the MNPD evidence property room. The rape kit was entered into evidence at trial.

Agent Charly Castelbuono, a DNA forensics expert with the Tennessee Bureau of Investigation ("TBI"), analyzed the victim's rape kit, which included buccal swabs, vaginal swabs, labial swabs, oral swabs, a rectal swab, and a perianal swab. Her examination revealed a "limited amount of spermatozoa," or sperm cells, present in the

---

[3]NICE is a video surveillance system used by Vanderbilt University.

vaginal swabs. Agent Castelbuono explained "[t]he major contributor is consistent with the victim's, and the limited minor contributor is consistent with . . . Brandon Vandenburg." She excluded Batey, McKenzie, and the defendant as contributors. Examinations of the vaginal, labial, rectal, perianal, and oral swabs did not reveal the presence of semen, and alpha amylase, a component of saliva, was not found in the labial swabs.

Agent Castelbuono also analyzed the victim's clothing. The victim's shirt and skirt "did not indicate the presence of semen." Two pairs of the victim's underwear indicated "a limited amount of spermatozoa." The DNA profile obtained from the victim's bra was "consistent with a mixture of at least three individuals," including the victim as the major contributor "and the limited minor contributor profile is from at least one male individual."

Detective Mayo continued his investigation on June 27, 2013, by interviewing the defendant, Vandenburg, Batey, and McKenzie, none of whom were charged with a crime or in custody at the time. The defendant's interview was recorded and played for the jury at trial. In the interview, the defendant denied seeing or participating in the sexual attack of the victim in Room 213. At the conclusion of the interview, Detective Mayo collected a DNA sample from the defendant and seized the defendant's cell phone. Detective Mayo explained the cell phone "was taken and turned into our evidence collection section, later retrieved, and later given, with a search warrant, to Detective Gish."

Additionally, on June 27, 2013, Detective Mayo searched Room 213 after obtaining consent from Vandenburg and Mr. Prioleau. At the time, Detective Mayo had not seen any videos or images captured on any of the cell phones pertinent to the investigation. Crime scene investigators, Felicia Evans and Sharon Tilley, photographed and processed the room. At trial, Ms. Evans explained the "call" to process Room 213 "was a little bit different from a typical crime scene that we would respond to in that it occurred several days prior to us being called out, and we were requested by a sex abuse detective to assist in the execution of a search warrant." Like Detective Mayo, Ms. Evans did not know exactly what crimes were committed in the room as she conducted the search.

At trial, Ms. Evans identified the layout of Room 213 through eleven photographs taken from the crime scene, including a panoscan of the scene. She explained a panoscan and its accompanying software allows investigators to create "a 360 degree flat image" of a crime scene and "allows you to embed additional photographs as links throughout the scan." Using a panoscan image taken from the front and back of Room 213, Ms. Evans identified the entry of Room 213, the interior of Room 213, the exterior door to Room

213, a fire evacuation safety plan of Gillette Hall, and the hallways and restroom outside of Room 213.

In conducting the search, Ms. Evans noted she smelled urine immediately upon entering Room 213. As a result, she "used an alternate light source to look for any types of bodily fluid that may be present" on "the floors, the walls, the ceiling, the bedding, clothing and towels located within the room." Ms. Evans "also noticed that the room was very disheveled and cluttered. But it appeared that all of the clutter had been moved away and there was a large clean uncluttered area on the floor." She swabbed the "large clean uncluttered area" for bodily fluids.

Ms. Evans photographed a white towel and a light green towel hanging on a hook before scanning them with an alternative light source. Both towels were entered into evidence at trial. In reviewing another photograph, Ms. Evans described a "fan . . . located on top of a plastic tub that had apparent throw-up or vomit type material dried on the side of the tub. That material was photographed and then it was collected." Two additional towels, one green and one red and white, were found on top of a large pile of garbage near the front door of the room. Ms. Evans scanned both towels with the alternative light source, noting "there was a small portion on the light green towel that fluoresced" and "[t]he red and white towel smelled heavily of urine." Both towels were entered into evidence at trial.

Agent Castelbuono examined the items collected from Room 213, including:

> There were swabs from the floor in front of the closet at 1900 South Drive, Room 213. There was crusty material from the tub on the floor beside the closet at 1900 South Drive, Room 213. There was a comforter from the lower bed, a brown fitted sheet from the lower bed, a white mattress cover from the lower bed, a pillow case and two pillow covers also from the lower bed, all from 1900 South Drive, Room 213.

She found the victim's DNA in the "crusty material." DNA obtained from spermatozoa found on the brown fitted sheet contained a mixture of DNA from the victim and Vandenburg. Vandenburg's DNA was also located on the green towel found near the door of Room 213, and another stain on the green towel included DNA from Vandenburg and an undetermined individual. Agent Castelbuono did not find semen on the red and white towel. The green towel from the hook on the wall indicated spermatozoa of a major contributor of an unknown male while a second stain on the green towel matched Vandenburg. The white towel from the hook on the wall did not indicate the presence of semen. The defendant's DNA was not found on any of the items tested.

- 8 -

Ms. Evans also processed a dresser, a condom box, and "a loose condom" found within the dresser for latent prints. From the condom box, Ms. Evans developed two latent prints. She also developed two latent prints from the door and the interior doorknob of Room 213. The latent prints were entered into evidence at trial. Julia Hooper, an expert in fingerprint identification and analysis, examined the latent prints lifted by Ms. Evans. She completed a report of her findings which was entered into evidence. In the report, Ms. Hooper noted McKenzie's left thumb and the defendant's right thumb were lifted from the condom box.

On June 28, 2013, Detective Mayo "wrote numerous search warrants to collect more digital evidence." He also returned to Room 213 to focus the investigation on the "bottom bunk area" occupied by Vandenburg. Photographs of the bottom bunk area showed Vandenburg's Apple laptop computer sitting on a chair. The laptop was seized pursuant to a search warrant. Detective Mayo executed search warrants on Room 614 of Gillette Hall, occupied by the defendant and McKenzie, from which he collected a Samsung laptop and a HP laptop. Detective Mayo also searched Batey's room on the 6th floor of Gillette Hall where he took a photograph of a white watch, noting he saw Batey wearing the watch "[i]n surveillance video and photographs." Additional evidence collected during the pending investigation and as identified by Detective Mayo at trial included the cell phones of Vandenburg, Batey, McKenzie, and Mr. Boyd and DNA swabs from Mr. Woods, Mr. Boyd, Mr. Van der Wal, Mr. Retta, Mr. Prioleau, Batey, McKenzie, and Vandenburg.

Detective Mayo provided Detective Gish with cell phones, computers, and surveillance footage collected during the investigation. At trial, Detective Gish testified as an expert in "computer forensics analysis, mobile device analysis, as well as the analysis of those digital images and criminal investigations."[4] Detective Gish began his investigation by attempting to establish a time line of the events of June 23, 2013. He reviewed surveillance footage which showed Vandenburg park in front of Gillette Hall "around 2:27 or 2:28 in the morning." At approximately 2:35 a.m., surveillance footage showed the defendant and Vandenburg "dr[ag] [the victim] out of an elevator and drop[] her on the ground. And right after that, these two individuals started taking either pictures and or videos with their cellphones." Detective Gish explained the surveillance footage at 2:35 a.m. "was a clue that there may be evidence of at least improper photography on these telephones." He stated:

> I started studying the video and saw where these four individuals
> went into this dorm room at 2:38 in the morning and nobody came out of

---

[4]Before Detective Gish testified, the defendant renewed his motion to suppress the evidence obtained from the search of his cell phone. The trial court, however, denied the same.

the dorm room until 3:10. So, of course, now I'm looking at two different things. First, I'm looking at to see if I can recover images or videos at 2:35 where it appears that these individuals are taking pictures of this woman. And, second, would there be any information on this phone to tell me what happened inside that dorm room from 2:38 to 3:10, roughly twenty-eight minutes.

Detective Gish next attempted to extract and analyze data from the cell phones of Vandenburg, Batey, McKenzie, and the defendant using the platforms Cellebrite and Oxygen. However, he failed to recover any images at 2:35 a.m. or between 2:38 a.m. and 3:10 a.m. from the cell phones of the defendant or Vandenburg. According to Detective Gish, the platforms could not recover any deleted images from the cell phones because the data was encrypted. Detective Gish then searched for "evidentiary artifacts," like the "miniature images" found within the thumbnail database of a cell phone. He explained "[e]ven though the images were deleted and they're encrypted and they can never be recovered, the good thing with computer forensics in these investigations are these artifacts are left behind." Specifically, the iPhone saves two copies, or thumbnails, of the images captured on the phone, a 158 x 158 image and a 120 x 120 landscape image. Detective Gish "recovered these two database files manually and then processed them manually to recover many of the images that had been deleted off of Vandenburg's phone." According to Detective Gish, the eleven images recovered from Vandenburg's cell phone "appeared to be a sexual assault."

Detective Gish next determined when the images recovered from Vandenburg's cell phone were taken through EXIF data, or exchangeable image format data. He explained, however, that EXIF data is not created when thumbnails are created. Instead, Detective Gish looked to the last allocated, or available, image taken before the incident and the first allocated image taken after the incident to determine the file numbers of the missing images. In doing so, Detective Gish discovered "an image sequence gap between images 1391 and 1408" and determined the deleted images "fell within the time frame of the sexual assault."

In analyzing Vandenburg's cell phone further, Detective Gish determined Vandenburg made four phone calls and sent "text messages that referenced a sexual assault" as the crimes ensued. A call log generated from Vandenburg's cell phone was entered into evidence. Detective Gish also reviewed a "time line report" of Vandenburg's cell phone, which detailed the actions taken on the cell phone between the evening of June 22, 2013, and the afternoon of June 23, 2013. A two-page portion of the time line report was entered into evidence.[5] In analyzing Vandenburg's laptop computer,

---

[5]The content of Vandenburg's text messages were deleted in the report.

Detective Gish learned Vandenburg "had accessed pornography sites" between 2:38 a.m. and 3:10 a.m. The State entered a list of the accessed web sites into evidence.

Detective Gish also determined Vandenburg sent "either images or videos" related to the sexual assault to two friends living in California, Joey Quinzio and Miles Finley. Detective Gish interviewed Mr. Quinzio and Mr. Finley and executed search warrants against them. Though Detective Gish did not recover any evidence from their cell phones, he did recover evidence from Mr. Quinzio's computer. Specifically, a text message conversation between Vandenburg and Mr. Quinzio was recovered from Mr. Quinzio's laptop "in its entirety." Vandenburg also sent two videos of the assault to Mr. Finley and Mr. Quinzio at 2:36 a.m. and 2:40 a.m. Vandenburg sent a third video at 2:49 a.m. to Mr. Finley, Mr. Quinzio, Mr. Boyd, and Mr. Carta-Samuels. Screen shots of the text messages recovered from Mr. Quinzio's laptop with the content redacted were entered into evidence along with a CD containing the three videos recovered from Mr. Quinzio's computer. The State published the three videos to the jury, which included a thirteen-second video taken at 2:35:15 a.m., a six-second video taken at 2:40:10 a.m., and a forty-two-second video taken at 2:40:50 a.m.

Detective Gish also analyzed the victim's cell phone. He created an "Event Log Report showing the activity of the victim's phone, married down to the time of the incident." On June 23, 2013, there was no activity on the victim's cell phone until 7:54 a.m.

Detective Gish then detailed his search of the defendant's cell phone. After several of the passcodes provided by the defendant did not unlock the phone, Detective Gish bypassed the passcode protections by utilizing the lockdown file, or a security file that "marries" a cell phone and a computer together, from the defendant's computer. After doing so, Detective Gish analyzed the thumbnail database files from the defendant's cell phone and similarly discovered an image sequence gap from which he ultimately recovered twenty-three thumbnail images. Detective Gish searched the cell phones of Batey and McKenzie in the same manner. He recovered eight images of the sexual crimes from Batey's cell phone, but he did not recover any images from McKenzie's cell phone.

In total, Detective Gish recovered forty-two images and three videos from the cell phones and computers searched during the investigation. At trial, Detective Gish detailed what the images appeared to show in relation to the sexual crimes committed against the victim. The defendant objected to Detective Gish's narration of the same, but the trial court allowed his testimony. Specifically, as it relates to the defendant, Detective Gish identified three pictures taken from various angles on the defendant's cell phone that appeared to show the defendant's "hand pulling the victim's vagina apart." Detective

Gish described the defendant's actions as seen in another picture recovered from Batey's cell phone, as follows:

> But we see that [the defendant] has his left thumb in [the victim's] vagina, pulling her vagina apart, and we see that bracelet that we've seen [the defendant] in, or that I have seen [the defendant] wear, on the left, on his left arm, his left wrist. He's also lighter skinned than [] Batey, and that appears to be his arm. And we also see that that's [the defendant's] phone in his right hand and he appears to be taking one of those images that we saw off of his phone earlier.

From Vandenburg's cell phone, Detective Gish identified a forty-two-second video clip showing a water bottle that appeared "to be inserted into [the victim's] anus."

McKenzie also testified concerning the images recovered by Detective Gish and provided his version of events leading up to and including the sexual assault of the victim. In June of 2013, he was eighteen years old and entering his sophomore year at Vanderbilt University, where he had been a member of the football team for one year. Prior to June 22, 2013, McKenzie had not met Vandenburg, but knew he was "a big recruit" for the football team. McKenzie's best friends were Batey and the defendant.

On the evening of June 22, 2013, McKenzie had "a few drinks" in his dorm room with Batey and the defendant. The trio then went to a "small gathering" at East Hall, another dormitory on campus, before eventually returning to Gillette Hall and going to their respective dorm rooms. Later, McKenzie and the defendant left their dorm room to get food at Qdoba. When they returned, they saw Vandenburg parked in front of Gillette Hall with the victim in the car.

Vandenburg told McKenzie and the defendant that "he [had] someone in the car and he need[ed] help getting up to the room." Vandenburg was "loud," and McKenzie "could tell he had been drinking." McKenzie saw the victim, whom he did not know, "passed out" in the car. He remembered Vandenburg stating "they had been to the Tin Roof. He got pretty drunk, she got pretty drunk, he couldn't get her back to her apartment and he had to bring her back [to Gillette Hall] and he needed help getting her to the room." McKenzie described Vandenburg as "kinda jacked, pumped, amped," but stated Vandenburg's request was made "[i]n a friendly way," and McKenzie did not feel like he had to help him. Batey joined the group outside of the dormitory before they entered Gillette Hall with the victim.

McKenzie stated they were all "laughing" and "joking" on the way to Room 213. Vandenburg jokingly pushed Batey off the elevator and McKenzie stayed with him. The

- 12 -

four men, however, reunited on the second floor where everyone "was still just having a good time, laughing, joking around, just like it was a[n] average night." The group then entered Room 213. McKenzie stated he did not feel pressured to go inside the room. Rather, he "was just going with [his] two best friends."

Once inside Room 213, the victim "was placed on the floor." She did not move or make any noise. Though he did not remember the exact sequence of events, McKenzie detailed the next thirty-two minutes for the jury. After a "little small talk," Batey began undressing the victim and "touching her body parts." Vandenburg attempted to wake up Mr. Prioleau, who was asleep, by "slap[ing] his bed" and saying, "we have this b**** in here" and "we was (sic) going to [f***] her." According to McKenzie, however, Mr. Prioleau "was asleep the whole time."

McKenzie detailed how the abuse continued through images and videos presented to the jury. He identified Batey "sticking his finger in [the victim's] anus" and "sticking his finger" in the victim's vagina in both video and images. In another video, McKenzie testified Batey "placed his behind on [the victim's] face" and, in a separate image, Batey is seen "attempting to stick his penis in [the victim's] mouth."

McKenzie described two incidents with a water bottle. First, McKenzie explained he thought Batey placed a water bottle in the victim's anus. After doing so, a video captured the defendants' behavior, which McKenzie described, as follows: "It's Brandon Vandenburg recording, laughing, egging him on, and it was [the defendant] reached over and squeezed the bottle, and [Batey] tries to, I guess attempt to have sex with [the victim], and Vandenburg told him he wasn't hard yet." Secondly, McKenzie stated the water bottle was "placed between [the victim's] legs" by the defendant. McKenzie was unsure "if it was inserted or not when it was, you know, down there between her legs." McKenzie identified the defendant "taking a picture between [the victim's] legs" in two separate images.

McKenzie also described the activities of the defendants not captured on video or in pictures. At approximately 2:49 a.m., McKenzie left Room 213 and went to the bathroom. When he returned, Vandenburg "had pulled his laptop out and pulled up porn, was trying to get a hard-on, splashed, took a bottle and poured water on himself, [and] threw water on [the defendant]." McKenzie also stated Batey had sex with the victim, "slapped [the victim] on the behind and urine (sic) on her." McKenzie saw Batey "make sexual motions and movements." Before Batey had sex with the victim, however, Vandenburg "grabbed condoms outta his dresser and passed them around and said we're gonna [f***] her." The defendant, McKenzie, and Batey each took a condom. Throughout the encounter, Vandenburg "was trying to get a hard-on, but he couldn't." Instead, Vandenburg "was just requesting that stuff be done, and whoever done it just did

- 13 -

it." McKenzie denied touching the victim and stated neither he nor the defendant used the condoms they took from Vandenburg.

During the attack, McKenzie stated the defendant "was standing off to the side" but was laughing and joking with the others. It was not until Batey "was slapping [the victim] and urine (sic) on her," that he and the defendant "tried to stop it." McKenzie "told [Batey] stop, he was hitting her too hard, she's gonna wake up. And [the defendant] also told [Batey] to stop, that he was doing it too much." Batey continued, however, and then Vandenburg "reached over and slapped [the victim] and said she wasn't gonna wake up." In total, McKenzie believed the victim was slapped "pretty forceful[ly]" on the buttocks "anywhere from five to ten" times. While Batey and Vandenburg slapped the victim, Batey "said he was gonna piss on her and he just done it." As he did, Vandenburg was "just egging it on, laughing." McKenzie did not recall the victim making any sounds during the abuse as he "figured she was drugged some type of way."

McKenzie and the defendant exited Room 213 when Batey began urinating on the victim, but Vandenburg followed them into the hallway and "told [them] to come back." The three entered the bathroom where McKenzie and the defendant were "kinda freaking out over what had just happened." McKenzie stated the defendant was upset about Batey urinating on the victim and slapping her on the buttocks. Vandenburg attempted to calm McKenzie and the defendant by telling them "everything will be okay." Vandenburg then "flushed condoms down the toilet," stating "his dad had beat a rape case and that he had flushed condoms down the toilet and, uh, that he do this all the time, like him and his friends did this before." McKenzie identified these movements in surveillance footage played at trial and explained he felt like he, and the others, could have left the room at any time during the abuse. Upon exiting the room, McKenzie did not think the defendant was upset.

At approximately 3:08 a.m., the defendant and McKenzie exited the bathroom and walked back towards Room 213. McKenzie stated he chose to go back to the room. The victim "had been pulled outside the room in the hallway," and Vandenburg began asking the defendant and McKenzie to "help him take her back to the car," but they refused. McKenzie stated Vandenburg was "still trying to convince us and he come (sic) up with the brilliant idea to put a towel over his head and go cover the camera." At 3:11 a.m., while Vandenburg is covering the camera, McKenzie "tapped" the defendant and the two "took off running back to [their] room." They laughed at Vandenburg using a towel to cover his head and the camera.

Surveillance footage from the sixth floor showed the defendant and McKenzie walking to their dorm room after leaving the second floor. The defendant did not seem

- 14 -

upset, but once in their dorm room, McKenzie and the defendant began "really asking ourself (sic) what just happened and was saying that, you know, we couldn't tell anyone, if this get (sic) out, we could get in serious trouble." McKenzie and the defendant were mainly concerned about "the slapping and the urine and everything." Batey later came to their dorm room. McKenzie stated "it was kinda awkward feeling in the room because of what just happened," specifically regarding the victim being slapped and Batey urinating on her. Batey eventually left their room, and McKenzie and the defendant went to sleep.

During the day on June 23, 2013, McKenzie and the defendant asked Batey, "did he get it in, and he told us that he did." McKenzie also learned from "a teammate, Chris Boyd, that a video had been sent out that night or early that morning." Mr. Boyd was concerned and explained he saw Batey "doing some things" on a video and "he knew [McKenzie] was there because he seen (sic) [his] shoes in the video." McKenzie "didn't want to put anything out there," so he responded, "you seen what you seen (sic)." Later, the defendant, McKenzie, Vandenburg, and Batey discussed the events of the previous night. Vandenburg stated the victim did not know what happened in the room, and "he called [the victim] over and had sex with her the next morning or the next day or something, and that he sent the video out to [Mr.] Boyd and [Mr.] Carta-Samuels, and that was it." "It was understood" Vandenburg had sex with the victim after the abuse "to just make sure she don't (sic) think nothing happened to her." McKenzie believed "that everything would just go unnoticed, that [Vandenburg] sent the video out to [Mr.] Boyd and [Mr.] Carta-Samuels and it was just going to be between us."

On this notion, McKenzie lied during his interview with Mr. Black but claimed he did not discuss what he planned to say with anyone prior to the interview. Rather, he told Mr. Black that he "was there, but nothing happened." McKenzie explained why he lied as follows: "I was, I didn't want, to get anyone in trouble, and that was embarrassing. I didn't want to put that out there." After the interviews with Mr. Black, McKenzie, Vandenburg, Batey, Mr. Boyd, and the defendant went to Popeye's to discuss what each said during their respective interviews. McKenzie believed Mr. Boyd was trying to help keep them out of trouble, and the group agreed not "to tell anything that happened until basically they can prove it." McKenzie lied again to the police during a subsequent interview, explaining he was "[s]till trying to protect myself and my teammates."

On July 17, 2013, after retaining counsel, McKenzie requested an interview with police after learning "that a video had came (sic) up and that [he] was seen in the video." During the interview, McKenzie told "[p]art of" the truth, noting he wanted to explain what he believed was on the video and he was "still trying to protect [his] teammates and [himself]." He "went in only to tell what [he] thought they knew" and attempted to make the encounter seem like "clowning around." In July 2014, after being charged for his participation in the crimes committed against the victim, McKenzie again met with police

- 15 -

and the District Attorney's office. McKenzie stated he told the truth during the interview about what he remembered happening in Room 213, and he claimed he has done so in every hearing since, including trial.

McKenzie stated he was still friends with the defendant and they talked approximately every other month. During their last conversation, the defendant asked McKenzie to travel to Houston so the two could talk about "a family matter." McKenzie explained the reference to a "family matter" indicated the defendant was saying "[t]hat it's time to come together." McKenzie had not spoken with the defendant since, though the defendant reached out to him two or three times.

During cross-examination, McKenzie stated he did not think he encouraged, promoted, or assisted his co-defendants on June 23, 2013. In June 2013, McKenzie weighed between 180 and 185 pounds, Vandenburg was 6'4" or 6'5" and weighed approximately 250 pounds, and Batey was 6'1" and weighed approximately 215 pounds. He described the defendant as the smallest amongst them. McKenzie acknowledged the importance of team loyalty to the Vanderbilt University football team. He explained when Vandenburg asked for help outside of Gillette Hall, it was "from a teammate standpoint." He was unaware of the defendant being singled out in football practice for additional physical contact. McKenzie did not believe the defendant had a feminine appearance and stated, "[f]rom my knowledge, when I'm around, he's never been called feminine."

McKenzie stated before entering Room 213, there was no discussion about molesting the victim. Rather, Batey initiated the crimes, in which Vandenburg quickly joined while he and the defendant did not. McKenzie stated he and the defendant could not stop Batey and Vandenburg after the attack began. Turning to the crimes committed against the victim with the water bottle, McKenzie thought Batey placed the water bottle between the victim's buttocks, after which Vandenburg told the defendant to squeeze the water bottle. He was unsure of the defendant's involvement in placing the water bottle between the victim's buttocks. McKenzie also stated the defendant touched the victim in another instance by spreading her vagina, but he could not explain the events leading up to the defendant's actions.

McKenzie "stepped out" of the room when Vandenburg used his computer to access pornography sites. When he returned, he noticed the defendant's shirt was wet but he did not know how that happened. McKenzie believed Vandenburg accessed pornography before passing out the condoms, which he and the defendant took and "stuff[ed] them in [their] pocket." McKenzie did not think he would have been perceived as unmanly had he refused to take the condom.

- 16 -

McKenzie "stepped out" of the room again as Batey's behavior began to escalate. The defendant also left the room, but Vandenburg followed them into the hallway and called them back. McKenzie "just wasn't thinking and went back." McKenzie was not concerned with his status on the football team at the time, and it did not weigh on his decision to speak with Vandenburg in the bathroom, where he was "pretty sure we was (sic) talking about what happened." After exiting the bathroom, the three walked back towards Room 213, where they saw the victim lying on the floor outside of the room. Within a minute or two, the defendant and McKenzie ran from the hall "because [Vandenburg] was kind [of] trying to force us to move her and that was our way to get away." McKenzie, however, stated he "wasn't afraid," and he did not think the defendant was afraid.

In the days following the crimes, McKenzie acknowledged he and his co-defendants planned to keep the events between themselves, but he learned videos were distributed and Mr. Boyd knew about their actions. After the Popeye's meeting, McKenzie again resolved to keep the information within the group. After a football team meeting, the coaches emphasized the importance of protecting the football team.

During re-direct examination, McKenzie stated he was not concerned for the defendant while they were in Room 213, and he did not remember Vandenburg threatening anyone during the abuse. Additionally, McKenzie stated he felt like he could have left Room 213 at any point, he did not hear anyone state that they could not leave the room, and he did not hear anyone ridicule the defendant while in the room. After the crimes, the defendant did not tell McKenzie he felt threatened or intimidated by Vandenburg on June 23, 2013, or subsequently by Mr. Boyd. McKenzie stated the football coaches did not tell them to lie about the events, and they were suspended from the team after speaking with Mr. Black but before speaking with the police.

Several additional witnesses who interacted with the defendants and the victim following the crimes also testified at trial. Mr. Prioleau testified he was asleep in Room 213 when he was woken up "by the lights coming on and some other older football players were in the room." At the time, he only recognized Vandenburg. He did not speak with the group, but raised his head and "saw the four, I just saw their heads, and I looked down and I saw a female on the floor in my dorm room." He did not know the victim but stated she was clothed and lying face down on the floor. Mr. Prioleau did not hear her speak or see her move, but he did overhear the following:

So, well, the lights went back off, and throughout that time I heard some conversations going on. I don't remember exactly what they were saying. I heard noises, I heard pornography playing at one point. I heard

people use the F word. And I heard one individual reference not being able to get an erection due to cocaine use.

He believed Vandenburg made the erection comment and testified Vandenburg kept condoms in his dresser drawer. He identified Vandenburg as saying "squeeze it" in an audio recording but could not identify any other voices.

As the abuse continued, Mr. Prioleau did not do anything to stop it, stating "I was just woken up, it was in the middle of the night I was unaware exactly what was going on. But I was just stunned and didn't want to have anything to do with what was going on." He believed the abuse lasted approximately thirty minutes, though he could not tell exactly what was happening to the victim and he did not actually see anything being done to her. When the noise stopped and he realized his fellow teammates were not in the room, Mr. Prioleau left and went to a friend's room "just to get out of there and whatnot." As he was leaving, he saw the victim in Vandenburg's bed. Mr. Prioleau did not hear any sounds of a physical struggle or fight and did not hear any specific threats amongst the four co-defendants.

When Mr. Prioleau returned to Room 213 around noon on June 23, 2013, he saw "vomit on the ground" in the corner. He cleaned up the vomit and admitted he did not report anything to Vanderbilt University or the police, noting "[a]t the time, like I said, I was stunned and didn't know exactly what had went on, and I had never been prepared or I never imagined being in a situation like this; and it didn't cross my mind that I was at a crime scene." Mr. Prioleau stated he told the truth during his interview with Mr. Black.

In the days following June 23, 2013, Mr. Prioleau learned Batey, McKenzie, and the defendant were in the room with Vandenburg during the abuse. He passed them outside of Gillette Hall and "was asked just to help them out." Specifically, the defendant asked if Mr. Prioleau "could help them out." After this interaction, Mr. Prioleau "never heard from anybody again." He retained an attorney and signed a Use and Immunity Agreement in relation to this case.

During cross-examination, Mr. Prioleau stated the victim appeared to be passed out and he did not do anything to stop the abuse because he "could never imagine being in a situation like that or anything." Mr. Prioleau stated he was "shocked. And to an extent, afraid, not fearful, but I just did not know what to do." When asked about loyalty to his teammates, Mr. Prioleau stated loyalty did not apply "in a situation like that."

Dillon Van der Wal, another former Vanderbilt University football player, also testified. On June 23, 2013, he had known Vandenburg for approximately two weeks and Batey, McKenzie, and the defendant for approximately one year. In the early morning

hours of June 23, 2013, Mr. Boyd received a phone call that Vandenburg "needed help." Mr. Van der Wal, Mr. Boyd, and Mr. Retta walked from their dormitory to Gillette Hall where they met Mr. Woods. The group entered the second floor of Gillette Hall and saw Vandenburg who seemed "a bit flustered at the time." The group walked down the hallway and saw the victim "laying (sic) with her head towards the door and her feet were in the hallway and her, I guess, dress or shirt, whatever it was, was around her midriff and her bottom was exposed." Mr. Van der Wal noticed "handprints on her . . . butt" and noticed she did not make any sounds or movements. Others in the group picked the victim up and placed her in Vandenburg's bed. Mr. Van der Wal saw Mr. Prioleau "exit[] the room when [he] walked in" but he did not see Batey, McKenzie, or the defendant in the room at the time. After moving the victim to the bed, Mr. Van der Wal, Mr. Boyd, Mr. Retta, and Vandenburg returned to East Hall. Mr. Van der Wal described Vandenburg, as follows: "Uh, he seemed a bit confused. The stories that he was telling were contradicting themselves. He used multiple names to describe what had happened, but he was kind of all over the place at that time."

At East Hall, Vandenburg went to Mr. Carta-Samuels room and grabbed his cell phone because "[h]e was saying there was a video to delete." Mr. Van der Wal "was confused, trying to, I guess, piece it all together. In my mind, I started to think why someone of similar size as me would need help moving his girlfriend or the girl that he was seeing at the time. So some of the stories didn't make sense to me." He did not, however, know what happened in Room 213 before he arrived. Though Mr. Van der Wal did not receive any videos or photos, he knew Mr. Boyd received a video, which was deleted. He described Vandenburg as "kinda out of it like he was flustered a bit." Vandenburg slept in Mr. Van der Wal's room, but he was not there when Mr. Van der Wal awoke.

Mr. Van der Wal clarified on cross-examination that he went to Gillette Hall because Vandenburg needed help. When he saw the victim on the floor outside of Room 213, Mr. Van der Wal explained his thoughts: "People have gotten sick before, passed out, and hand prints are something that happens with relationships. So I didn't know at the time that it was necessarily foul play." Back at East Hall, the group began discussing and trying "to make sense of what happened that night." Mr. Boyd and Mr. Carta-Samuels, however, received videos and expressed concern over the same. Mr. Van der Wal acknowledged he did not contact anyone after helping Vandenburg. He also acknowledged that team loyalty is important, but stated: "To say that culture existed at Vanderbilt is, I think, a little ridiculous, that accepting that something like this is happening is okay, and reporting that wouldn't be an acceptable thing to do is a little ridiculous in my mind." Though Mr. Van der Wal did not contact the authorities, he stated he told them what he knew at their request. Based on what he had learned

- 19 -

happened in Room 213, he "[o]ne hundred percent" would have reported it. He stated football team loyalty did not extend to criminal behavior, including rape.

Ms. Miller, the victim's roommate, further testified to her interactions with the victim the day after the abuse. When she saw the victim in the "late morning, early afternoon" of June 23, 2013, the victim was "very out of sorts." Physically, Ms. Miller described the victim, as follows:

> And just kind of starting top to bottom, her hair was very matted. It looked like it had gotten wet and then been dried again, which we found very strange because we didn't know how it could have gotten wet and dried again. She had vomit crusted in her hair behind her ear, and she also had vomit crusted on her top, on her shirt. And in addition to that, she had a huge gash on her knee that was pretty deep, and she also had several bruises up and down her legs.

Ms. Miller stated the victim's shirt was "very stiff, as if it had been wet and then dried." The following day, Ms. Miller and the victim found additional bruises on the back of the victim's thighs and buttocks. A photograph of the bruising was entered into evidence.

As noted above, the victim consented to a medical examination on June 26, 2013. Kathryn Parnell, an expert sexual assault nurse examiner, performed the exam. Though the exam was not performed within the 72-hour time frame preferred for sexual assault exams, Detective Mayo "still wished for the exam to be performed with the [victim's] consent." During the exam, the victim provided a history of the events she could remember to Ms. Parnell. The victim remembered talking with friends at Tin Roof around midnight, stating "she drank more than usual" the night of the incident "and that a woman was buying drinks for her group of friends." The victim next remembered waking up at 8 a.m. alone in Vandenburg's dorm room. Accordingly, the victim did not know if she had been penetrated, if there had been ejaculation, or if a condom had been used during the possible abuse. The victim disclosed she had voluntary, vaginal intercourse with Vandenburg at approximately 5 p.m. on June 23, 2013.

Ms. Parnell reported the victim had a normal pelvic exam absent any visible trauma. During a physical exam, however, Ms. Parnell noted injuries throughout the victim's body, including bruises on her legs and buttocks and scratches to her ankles. Pursuant to protocol Ms. Parnell also collected: "pubic hair combings, . . . two labia swabs, two vaginal swabs, one rectal swab, two perianal swabs, two gumline swabs, two DNA buccal swabs, and two swabs of the vaginal pool . . . a urine sample and some blood samples." The report was entered into evidence.

The victim also testified. In June of 2013, she lived off campus with Ms. Miller as she worked on her honors research project at Vanderbilt University. By June 22, 2013, she had known Vandenburg for approximately two weeks, stating "[h]e seemed nice" and she "liked him at the time." On the evening of June 22, 2013, she met Vandenburg and friends at Tin Roof. At the bar, Vandenburg introduced her to an older woman who began buying drinks for them, and Vandenburg passed the victim drinks throughout the evening. The last thing she remembered was "taking a few sips of a drink that he gave [her] that was in a clear cup and that was blue." Vandenburg described the drink as the California version of a Long Island Iced Tea. He said, "it's so good, you have to try it, you have to try it." The victim did not remember if she finished the blue drink.

The victim woke up alone around 8 a.m. in an unfamiliar room. She was clothed and saw her cell phone and keys, but she could not find her shoes or purse. She determined she was in Gillette Hall, called her friend, Jake Bernstein, and went to his room. The victim acknowledged viewing surveillance footage showing her in the hallway wearing a green towel. She stated, however, she had no memory of the same. At the time of trial, the victim still had no memory of the attack.

When she left Gillette Hall, the victim was shocked to see her car outside. She got inside and noticed blood "smeared across" the passenger seat. She also noticed her left shoulder "hurt very badly" along with her left wrist and right knee. "But also I was sore and hurt everywhere and eventually realized I had a lot of bruises." The victim stated "I felt, when I woke up, very confused and sort of out of it. Then didn't really know what was going on." The victim sent Vandenburg a text message, stating "I think I woke up in your room, I don't know what's going on, or something like that, can you tell me." Vandenburg responded throughout the day with "his version of what happened." He complained the victim "had gotten sick in his room the night before and that he had to clean it up and that he spent the whole night taking care of [her]." Later in the day, however, Vandenburg asked the victim to come over and the victim "was glad that he wasn't mad anymore." The victim explained Vandenburg's demeanor shifted throughout the day from "sort of upset" to "suddenly . . . very nice." When the victim saw Vandenburg on June 23, 2013, he was being sweet and he "suddenly initiated intercourse." He did not ask her if she wanted him to use a condom. After this encounter, the victim "never saw him again. And the next time I heard from him, it was about him telling me he was worried he was going to get in trouble." The victim reviewed photographs from the attack and stated she was unconscious during the episode, she had never met the defendant, McKenzie, or Batey, and she did not give anyone permission to touch her.

At the conclusion of its proof, the State made the following election of offenses, which mirrored its correlating pre-trial filing:

Count 1 of the indictment alleges an act of Aggravated Rape against [the victim], and refers to the following conduct: The digital penetration of [the victim's] anus while [the victim] was unconscious on the floor of the dorm room located in Gillette Hall on Vanderbilt University Campus.

Count 2 of the indictment alleges an act of Aggravated Rape against [the victim], and refers to the following conduct: the digital penetration of [the victim's] vagina while [the victim] was unconscious on the floor of the dorm room located in Gillette Hall on Vanderbilt University Campus.

Count 3 of the indictment alleges an act of Aggravated Rape against [the victim] and refers to the following conduct: the penetration of [the victim's] anus with an object while [the victim] was unconscious on the floor of the dorm room located in Gillette Hall on Vanderbilt University Campus.

Count 4 of the indictment alleges an act of Aggravated Rape against [the victim] and refers to the following conduct: an act of fellatio upon [the victim's] mouth or lips while [the victim] was unconscious on the floor of the dorm room located in Gillette Hall on Vanderbilt University Campus.

Count 5 of the indictment alleges an act of Aggravated Rape against [the victim] and refers to the following conduct: the penile penetration of [the victim's] vagina while [the victim] was unconscious on the floor of the dorm room located in Gillette Hall on Vanderbilt University Campus.

Count 6 of the indictment alleges that an act of Aggravated Sexual Battery against [the victim] and refers to the following conduct: the touching of the primary genital area of [the victim] while [the victim] was unconscious on the floor of the dorm room located in Gillette Hall on Vanderbilt University Campus.

Count 7 of the indictment alleges an act of Aggravated Sexual Battery against [the victim] and refers to the following conduct: placing of buttocks on [the victim's] face while [the victim] was unconscious on the floor of the dorm room located in Gillette Hall on Vanderbilt University Campus.

The defendant then testified on his own behalf. The defendant stated he was recruited to play football at Vanderbilt University, where he claimed to be the smallest

person on the football team at 5'10" and 140 pounds. The defendant asserted he was treated differently by his teammates because of his size, where he was from, how he wore his hair, and the types of clothing he wore. Also because of his size, the defendant was ridiculed "[a]ll the time," singled out in football practice, and "put against bigger players to show that [he] wasn't big enough to play at that level." Additionally, the defendant "would be on the phone with [his] girlfriend a lot and not really talking to other girls, so they thought [he] was gay." The defendant was friends with McKenzie and Batey. However, the defendant "bumped heads" with Batey because "[Batey] thought that [the defendant] was gay." The defendant stated he did not complain about the treatment he received from his teammates.

Before June 22, 2013, the defendant had not met Vandenburg but knew him to be a top recruit to the football team. That evening, the defendant, Batey, and McKenzie went to "a little get-together" at East Hall with other members of the football team for about an hour. The three were drinking, but the defendant "wasn't overly drunk." The group then moved to the parking lot outside of East Hall to continue "partying." After another hour, the defendant and McKenzie went to get food at Qdoba while Batey went to his dorm room with another woman. When McKenzie and the defendant returned to Gillette Hall, Vandenburg got out of a car and approached McKenzie. Vandenburg asked McKenzie and the defendant to help him "get this girl to the room." The defendant and McKenzie walked to the car and saw the victim, who was "clearly out of it" and "clearly looked sick." The defendant stated, "I've never been exposed to alcohol like that." Batey then joined the group outside of Gillette Hall, and Vandenburg "stresse[d]" to Batey "that he need[ed] help getting [the victim] to the room." The defendant described Vandenburg as "kinda frustrated" and "aggressive," noting "[Vandenburg] seemed like he really needed help and he was going to get help." The defendant took Vandenburg's request for help "as an order from a teammate."

Vandenburg then picked the victim up from the car and carried her into Gillette Hall. The defendant, Batey, and McKenzie followed. The defendant explained his thoughts at the time:

> Nobody said that we should take her to the hospital. In fact, like everybody was just laughing, so. It just seemed okay. Like when I first saw her, I was thinking that she was sick. But I mean if no one else was concerned, I didn't feel the need to be concerned at that point, either.

Once inside Gillette Hall, the defendant stated Batey was "clowning" and asking Vandenburg, "how did you get [the victim] this drunk or whatever." As a result, Vandenburg pushed Batey out of the elevator. The defendant remained in the elevator with Vandenburg and the victim where Vandenburg did "not really" drop the victim but

he also did not "carefully place her down, either." When they reached the second floor, the defendant described Vandenburg's handling of the victim, as follows: "She's dropped. She's drug out and he just lets her go." Vandenburg then went to the bathroom, leaving the defendant "stuck looking at the girl for a few seconds." The victim "started to throw up some more." The defendant thought she needed to go to the hospital and told Vandenburg the same. Vandenburg replied, "F that, my room is right down that hall." When the defendant repeated himself, Vandenburg told him to "stop being a B."

Additionally, upon exiting the elevator, the defendant "immediately" tried to help the victim after realizing Vandenburg was "too drunk to help." The defendant stated: "I'm gonna try to get her myself. So I try to toss some of my food that I had, and [Vandenburg] slaps my food, calls me some more names, and then says man, take some f-ing pictures. And then he starts taking some pictures. I get out the way of his camera shot, and I do take pictures." The defendant testified he began to realize "this dude's crazy." Vandenburg told the defendant to take pictures of the victim because his phone was "f-ing dying or . . . f-ing dead." The defendant complied and admitted to getting "pretty close to her, uh, rear end" to take pictures.

After doing so, the defendant grabbed the victim by her ankles as Vandenburg grabbed her wrists and the two carried her down the hall towards Room 213. Seconds later, Batey and McKenzie joined them, and Batey continued to joke about the situation. Vandenburg carried the victim into Room 213. The defendant described the situation as "kinda funny because it's now a drunk person carrying a drunk girl . . . [b]ecause I mean you see it. Like you see drunk people all the time. Uh, I mean, it just didn't cross my mind that anything was about to happen." The defendant "thought [the victim] was gonna be safe" and denied any discussions about abusing her.

Inside Room 213, Vandenburg and Batey put the victim on the floor because she was vomiting. The defendant placed a towel under her head "so that if she throws up, she throws up into that so she doesn't like choke on throwup or anything. Because she's obviously sick." Batey and Vandenburg started talking about football before "[t]hey said they were gonna f*** her." McKenzie told Batey and Vandenburg to "chill out," and the defendant stated, "I'm out." However, "as soon as I said I'm out, that's when they hop on me and was like naw, you're not f-ing going nowhere." The defendant "didn't know whether it was I wasn't going no f-ing where because of what was about to happen or if I wasn't allowed to go anywhere because of they didn't want me to leave and tell or something like that." As a result, the defendant was intimidated and fearful, and he "didn't know what was gonna be the outcome of them trying to keep me in the room." Batey began touching the victim "in her vagina area with her panties on" as the defendant, McKenzie, and Vandenburg watched. The defendant described Vandenburg as "laughing and goofing off . . . [l]ike he kinda like wanted this to happen." The

defendant stated he "didn't want to be a part of it, really. But [he] didn't feel like [he] could leave at that point."

Batey then removed the victim's underwear and began rubbing her buttocks. Batey wanted the defendant "to touch her or something" and stated, "you're not gonna b**** out like you b****** out last night."[6] The defendant took this comment as a threat, and Batey began saying that the defendant "was a b**** and a p**** and a f**." The defendant stated he "didn't like it at all" how Batey was treating him, but he refused to touch the victim. Vandenburg, however, told him "to take some f****** pictures." The defendant stated Batey wanted "to put his finger in her" and also wanted the defendant and McKenzie to touch the victim. Vandenburg was "tripping out, going crazy" and also wanted the defendant and McKenzie to touch the victim. The defendant again refused but took pictures of the victim on Vandenburg's orders. Vandenburg then "shove[d]" a water bottle in the defendant's chest and told him "to put the f-ing bottle in her." The defendant explained the victim's legs were open, and he bent "down as if I'm about to put the bottle in her, but I don't touch her with the bottle. I don't at all. But I'm in between her legs, and [Batey] grabs the bottle from me, calls me a f**, and he puts the bottle in her." The defendant stated the bottle was "by her vagina." Batey then "flip[ped] [the victim] over and start[ed] putting his finger in her" anus. The water bottle was moved "in between [the victim's] butt cheeks." According to the defendant, Batey and Vandenburg told him to squeeze the water bottle and he did so. Batey then "tried to have sex with [the victim] right after [the defendant] squeezed the bottle." The defendant stated he was scared and he did not receive any pleasure from squeezing the water bottle. He also stated McKenzie was "just standing there" as the abuse took place.

The defendant continued describing the abuse of the victim, stating Vandenburg "trie[d] to masturbate using another water bottle that actually had water in it. He pour[ed] it on his self" as the defendant and McKenzie stood "off to the side." Batey continued to "mess with" the victim as Vandenburg "turn[ed] on porn" and stated "we're going to f this b." Vandenburg threw water on the defendant and McKenzie and then said, "don't have sex with her without a condom, I got condoms." Vandenburg passed condoms out to the group and Batey "actually puts it on and is trying to have sex with her" but the defendant could not "see if he was actually penetrating her butt."

The defendant admitted pictures of the abuse were taken throughout and admitted he is in a picture touching the victim's vagina. According to the defendant, Vandenburg told him "to spread, spread that sh**." The defendant also acknowledged a picture of Batey taking a picture of him touching the victim, but testified he only touched the victim

---

[6]The defendant made an offer of proof regarding an incident that occurred the night before the present crimes. The trial court, however, did not allow the proof into evidence.

once despite multiple pictures of him doing so. The defendant stated "if you hold the button [on the phone], it can take multiple pictures." The defendant explained his participation, as follows: "They was (sic) riding me. At one point, Vandenburg said that he was going to f*** me up. Vandenburg is 6'6", 270. [Batey is] 6'1", 220, 215. What am I gonna do about it? [McKenzie] isn't gonna help me. He's standing off to the side." McKenzie, however, left the room during the abuse. When asked why he did not leave the room, the defendant stated:

> Where was I gonna go? I mean they said I couldn't leave. Vandenburg is beside me. Even if I did leave, I still gotta see him later on that night or even in practice or in the locker room. You can't, you can't, you can't escape that. Not at that atmos -- You can't escape the football atmosphere. You have to see, I see them every day. We work out every single day. We're in the same locker room every single day. Even if I did get out.

The abuse continued. Batey was "still trying to get an erection, and he, uh, he's trying to put his penis in [the victim's] mouth." At various points in time, the defendant stated Batey claimed the victim bit his penis, Batey "was masturbating over the top of [the victim]," and Batey "tried to sit on [the victim's] face." When Batey and Vandenburg began "slapping" the victim's buttocks, the defendant and McKenzie worried the victim would wake up. Vandenburg, however, stated "she's not gonna wake up" and "[s]lap[ped] her harder." The defendant described this as "the breaking point to where it was for them sexual to now violent."

When Batey stated he was "gonna pee on [the victim]," the defendant and McKenzie ran out of the room. Vandenburg followed them and called McKenzie into the bathroom. The defendant followed, stating he "felt as though I would still be looked at as that gay f** that doesn't want to have anything to do with it." In the bathroom, Vandenburg told McKenzie and the defendant not to worry about the abuse because he "do[es] this all the time." Vandenburg claimed his "father beat a case like this, just flush the condom down the toilet." The defendant was in shock and thought, "what in the world did I get myself into." When McKenzie and the defendant left the bathroom, they agreed to "get [Batey]" from the room. At that point, however, the victim "was already pulled out into the hallway" and Vandenburg asked for help taking the victim to her car. The defendant refused. Vandenburg then "trie[d] to cover up the camera," McKenzie "taps" the defendant, and the two ran to their dorm room. The defendant ran "[b]ecause we felt like we escaped. It was, it was terrible. I wanted to get away. [McKenzie] wanted to get away." The defendant admitted to smiling on the surveillance footage as he exited Room 213, but explained he was in shock and confused and "it's not a smile

like what just happened was funny." Back in his room, the defendant called his girlfriend. Batey later stopped in the room to talk to the defendant and McKenzie.

The next morning, the defendant deleted the pictures taken the night before from his cell phone, stating "what went on was wrong" and noting Batey was "kinda feeling bad for his actions too." The defendant also learned "Vandenburg had supposedly sent the picture to [Mr.] Boyd and [Mr.] Carta-Samuels." Subsequently, Mr. Black interviewed the defendant and other football players. The defendant felt threatened on the way to the interview because Mr. Boyd and Vandenburg told the group, "only you guys know what went on in that room, keep your mouth shut." The defendant lied during his interview with Mr. Black, claiming "I was afraid to go against the story. I was afraid of what was going to happen to me if I went against the story." The defendant also explained he did not consider reporting the abuse because "you don't report stuff like that" and "you don't leave your brother hanging. You, you protect your brother."

After the interviews, the defendant went to Popeye's with Mr. Boyd, McKenzie, Batey, and Vandenburg but stated he remained outside the restaurant talking to his brother on the phone. Regardless, the defendant explained Mr. Boyd suggested they needed to "make sure [the victim] doesn't find out or she doesn't think any foul play was involved." As such, Mr. Boyd told Vandenburg to have sex with the victim "as soon as possible," and Vandenburg complied. Mr. Boyd explained "if anything does come up, y'all just had sex, just had consensual sex, so there wouldn't be a red flag in her mind so she wouldn't think anything."

At a subsequent football team meeting, head coach, James Franklin, told the team they "needed to look out for each other and anchor down." The defendant believed if he did not "take this serious[ly]" he might "be put in a bad situation at practice or possibly [be] sent home." The defendant stated the coaches emphasized "loyalty and to be quiet." As such, the defendant lied in his interview with Detective Mayo, stating again, "I was still afraid of [Batey] and Vandenburg and the team. [Mr.] Boyd included. I didn't know what was going to happen if they found out that [I] was the one that broke the rule of the team." Days later, the defendant was suspended from the football team and eventually expelled from Vanderbilt University. Regarding his involvement in the victim's abuse, the defendant stated he felt "[t]errible. That wasn't my intent. The goal was to, the goal was to get her to the room. And I feel terrible because I feel like I was being selfish and worried about myself instead of her."

During cross-examination, the defendant admitted he could have walked away from the situation when Vandenburg asked for help in the parking lot outside of Gillette Hall. He agreed the group was smiling and laughing as they entered Gillette Hall and again admitted he could have left before getting on the elevator. He did not leave,

however, and testified he did not feel like his life was in danger when Vandenburg went to the bathroom upon exiting the elevator on the second floor. Rather, the defendant was "concerned at that point" for the victim and was "just thinking that she needs to get to the hospital." When Vandenburg returned, the defendant expressed the same but Vandenburg disagreed and told him to stop being "a b**** and a f**." Vandenburg dragged the victim into the hallway, and the defendant realized Vandenburg was drunk. The defendant testified he planned to pick the victim up and take her to Vandenburg's room on his own, but Vandenburg slapped the defendant's bag of food and ordered him to "take some f****** pictures" of the victim. The defendant complied because he "didn't want no problems with" Vandenburg and "was afraid that [he] was gonna be seriously hurt" if he did not take pictures of the victim in the hallway. The defendant was afraid as he took pictures of the victim, noting he "didn't know what was going to happen to me." He described Vandenburg's tone as aggressive throughout this encounter and stated he "was not having a good time" despite smiling on surveillance footage. The defendant explained:

> I did think it was a big deal that he was being this way. That the girl, the victim, I thought we, that we was still going to get her to the room safely. I'm eighteen. If all we gonna do is, you know, all he wanted was a picture, then get him off my back, I didn't think that it was that big of a deal. I'm trying to get him off my back.

When McKenzie and Batey arrived on the second floor, everyone was laughing. The defendant "felt safer" with McKenzie and Batey, there and he did not feel he would be injured or killed from the situation. The defendant continued to Vandenburg's room, stating he did not leave because he "didn't want to leave [his] teammates."

When Vandenburg stated they were going to "f" the victim, the defendant "attempt[ed] to go to the door." Vandenburg, however, told the defendant he could not leave. Batey then took the victim's underwear off and "then he put his fingers in her." The defendant did not remember taking a picture of Batey's actions, noting Vandenburg took his cell phone at some point. The defendant admitted to taking pictures of the victim as Batey penetrated her anus with his finger. The defendant also admitted to touching "the outside of [the victim's] leg twice" and that he "maybe" touched "the edge" of the victim's vagina. The defendant admitted he stayed in the room as Batey raped the victim, as Vandenburg watched porn to attempt to get an erection, as Vandenburg put a condom on, and as Batey and Vandenburg hit the victim on the buttocks. The defendant again admitted to touching the victim and squeezing the water bottle as it was inserted in her, stating "I squeezed the bottle, yeah. And I touched her."

While in Room 213, the defendant worried he might be "[s]eriously hurt[,] [e]ither that night or the next night or the next day," and he could not leave as a result. The defendant again explained, "I was terrified for what they was (sic) going to do to me in the room or even after if I didn't do it, yeah." Despite this fear, the defendant and McKenzie refused to help Vandenburg take the victim back to the car after the abuse. During the pending investigation, the defendant did not disclose the fear he felt during the interviews he had with Mr. Black, detectives, or the District Attorney's office because they did not ask. Further, the defendant stated: "I told them that they were calling me gay. I told them I was being picked on. I told them. I didn't go into detail, no. But they didn't ask. They didn't care. They wanted [Batey] and Vandenburg."

Ladarius Banks and Brian Kimbrow, both former teammates of the defendant, also testified on his behalf. Mr. Banks described the defendant as "a try hard type of guy. He came every day with a mentality to do his best." "He was, of course, the youngest, one of the youngest and the smaller players on, on the team, and also within his position." Mr. Banks stated the defendant was subjected to serious bodily harm on the football field and that he was aware the defendant continued to play football after leaving Vanderbilt University. Mr. Kimbrow testified football players are subjected to serious bodily injury during practice and games.[7]

The State presented rebuttal proof from Mr. Van der Wal and Detective Gish. Mr. Van der Wal explained in June of 2013, the football team was in a "no contact practice period[]," meaning the players did not wear helmets or pads but participated in drills, running, and lifting weights. Detective Gish further stated he analyzed numerous cell phones of many football players for evidence relating to the victim's abuse before and after the crimes were committed. In doing so, he did not find any threatening or teasing messages related to the defendant. He did determine the defendant had daily contact with a girlfriend in Maryland.

At the conclusion of the proof, the jury returned a verdict of not guilty as to counts 1, 2, 4, 5, and 7, finding the defendant guilty of counts 3 and 6, aggravated rape and

---

[7]In support of his duress defense, the defendant offered the testimony of Mr. Banks and Mr. Kimbrow concerning the culture of the football team and how the defendant was treated by the same. The trial court, however, only allowed them to testify as character witnesses. As such, pursuant to Rule 405 of the Tennessee Rules of Evidence, the trial court then held a jury-out hearing and ruled Mr. Banks and Mr. Kimbrow could testify regarding the defendant's character as a football player but limited the witnesses from testifying to the names the defendant was called by members of the football team.

aggravated sexual battery, respectively. For the two convictions, the trial court imposed an effective fifteen-year sentence.[8] This timely appeal followed.

### *Analysis*

I. *Motion to Suppress*

On appeal, the defendant argues officers searched his cell phone pursuant to an invalid search warrant, and the trial court erred when allowing the introduction of the evidence seized during the search. The Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution guarantee freedom from unreasonable searches and seizures. These guarantees exist to "safeguard the privacy and security of individuals against arbitrary invasions of government officials." *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967); *see State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997). A search and seizure conducted under a valid search warrant is presumptively reasonable, but a warrantless search is presumptively unreasonable, and the evidence discovered is subject to suppression unless the State demonstrates the search or seizure was conducted pursuant to an exception to the warrant requirement. *State v. McCormick*, 494 S.W.3d 673, 678 (Tenn. 2016) (internal citations omitted). The State has the burden of demonstrating, by a preponderance of the evidence, that a warrantless search passed constitutional muster. *State v. Harris*, 280 S.W.3d 832, 839 (Tenn. Crim. App. 2008).

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV. Accordingly, to comply with the federal and state constitutions, a warrant must (1) be issued by a neutral and detached magistrate, (2) particularly describe the place to be searched and the persons or things to be seized, and (3) be based upon probable cause, "supported by Oath or affirmation." *State v. Davidson*, 509 S.W.3d 156, 182 (Tenn. 2016).

Similarly, the counterpart in the Tennessee Constitution states:

---

[8]The trial court imposed a fifteen-year sentence in count 3 and an eight-year sentence in count 6 to be served concurrently.

That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offenses are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

Tenn. Const. art. 1, § 7.

Tennessee law then imposes an additional affidavit requirement. *See* Tenn. Code Ann. § 40-6-103 (providing a "search warrant can only be issued on probable cause, supported by affidavit, naming or describing the person, and particularly describing the property, and the place to be searched"); *see also* Tenn. R. Crim. P. 41(c) (stating that a "warrant shall issue only on an affidavit or affidavits that are sworn before the magistrate and establish the grounds for issuing the warrant" and requiring any subsequently issued warrant to "describe the property or person to be seized"). The commonly recognized exceptions to these warrant requirements are: (1) search incident to an arrest, (2) the plain view doctrine, (3) consent to the search, (4) *Terry* stop and frisk, and (5) the existence of exigent circumstances. *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005).

Aside from the exceptions to the warrant requirement, illegally obtained evidence is admissible under the inevitable discovery doctrine if it would have otherwise been discovered by lawful means. *Nix v. Williams*, 467 U.S. 431, 444 (1984); *State v. Ensley*, 956 S.W.2d 502, 511 (Tenn. Crim. App. 1996). Under this doctrine, the exclusionary rule is inapplicable if the prosecution can establish that had certain proper and predictable investigatory procedures been used in the case at bar, those procedures would have inevitably resulted in the discovery of the evidence in question. *State v. Coury*, 657 S.W.2d 777, 780 (Tenn. Crim. App. 1983). Proof of inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Nix*, 467 U.S. at 444 n.5.

Questions of credibility, the weight and value of evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, so factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). When the trial court does not set forth its findings of fact upon the record of the proceedings, this Court decides on its own where the preponderance of the evidence lies. *Fields v. State*, 40 S.W.3d 450, 457 n.5 (Tenn. 2001); *see also Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997). As in all cases on appeal, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be

drawn from that evidence.'"  *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000). Appellate courts, however, conduct a de novo review of the application of the law to those facts.  *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

Here, the defendant filed a motion to suppress the evidence obtained from the search of his cell phone, arguing the search was constitutionally deficient because it was done absent a warrant or his consent.  The State argues the defendant consented to the search "by providing passcodes for the phone" and claims "this issue does not matter much [as] [the] [d]efendant was convicted on the strength of images that Vandenburg and Batey recorded."[9]  Our review of the record before us demonstrates the trial court erred in denying the motion to suppress.  For reasons explained below, however, the error was harmless.

The record makes clear the search warrant executed on June 28, 2013, did not cover the defendant's cell phone.  As noted by Detective Mayo at the suppression hearing, the search warrant was issued against the defendant's dorm room and his person and allowed for the search and seizure of the defendant's electronic devices.  The defendant's cell phone however, was not in the defendant's dorm room or on his person during the execution of the search warrant as it had previously been seized by Detective Mayo on June 27, 2013.  When Detective Gish subsequently searched the defendant's cell phone, the search was done absent an applicable warrant and in violation of the defendant's constitutional rights.  Therefore, the trial court erred in denying the defendant's motion to suppress the evidence obtained from the illegal search of his cell phone.

The trial court's error does "not require automatic reversal."  *State v. Hawkins*, 519 S.W.3d 1, 37 (Tenn. 2017) (citing *State v. Rodriquez*, 254 S.W.3d 361, 371 (Tenn. 2008)).  Rather, "[t]he erroneous admission of evidence obtained in violation of a defendant's rights under the Fourth Amendment and article I, section 7 is a non-structural constitutional error, subject to harmless error analysis."  *Id.* (citing *State v. Hutchison*, 482 S.W.3d 893, 921 (Tenn. 2016)).  "Reversal may be avoided if the State demonstrates 'beyond a reasonable doubt that the [non-structural constitutional] error complained of did not contribute to the verdict obtained.'"  *Id.* (quoting *Rodriguez*, 254 S.W.3d at 371 (internal quotation marks and citations omitted)); *see also Neder v. United States*, 527 U.S. 1, 15, (1999); *Chapman v. California*, 386 U.S. 18, 24 (1967).

---

[9]The State also argues the search was valid under a theory of inevitable discovery and the good faith exception.  However, we note, our supreme court has not recognized the good faith exception in this situation and we decline to apply the same.

Within this context, this Court is tasked with "ascertain[ing] the actual basis for the jury's verdict," which requires the Court "to focus on the impact the error may reasonably be taken to have had on the jury's decision-making." *Hawkins*, 519 S.W.3d at 37. (internal citations omitted); *see also* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Thus, "[a]s a non-structural constitutional error, the erroneous admission of this evidence is only harmless when it appears beyond a reasonable doubt that its admission did not contribute to the verdict obtained." *Hutchison*, 482 S.W.3d at 921 (citing *State v. Ingram*, 331 S.W.3d 746, 759 (Tenn. 2011); *see State v. Sanders*, 452 S.W.3d 300, 306 (Tenn. 2014) ("if the trial court commits a nonstructural constitutional error, the appellate court may still 'affirm the conviction if the State proves beyond a reasonable doubt that the error did not affect the verdict'")). The burden falls on the State to establish the error is harmless beyond a reasonable doubt. *Id.* (citing *Rodriguez*, 254 S.W.3d at 371).

Here, the record makes clear the trial court's error in this instance was harmless. Though the State presented 23 images illegally recovered from the defendant's cell phone to the jury at trial, the record is replete with additional, significant evidence supporting the defendant's convictions. Specifically, in reviewing surveillance footage from Gillette Hall, Captain Harville, Detective Mayo, Detective Gish, McKenzie, and the defendant identified the defendant entering and exiting Room 213 with the unconscious victim on June 23, 2013, between 2:38 a.m. and 3:10 a.m. As it relates to the conviction for aggravated rape, a video recovered from Mr. Quinzio's laptop showed the defendant squeezing a water bottle that was inserted into the victim's anus. The video was sent from Vandenburg's cell phone at approximately 2:40 a.m. At trial, McKenzie and the defendant detailed the defendant's actions as seen on the video. McKenzie testified the defendant "reached over and squeezed the bottle" after Batey inserted it into the victim's anus, and the defendant, after viewing the video, admitted to doing the same. Regarding the conviction for aggravated sexual battery, Detective Gish described an image recovered from Batey's cell phone which showed the defendant's "left thumb in [the victim's] vagina, pulling her vagina apart." McKenzie echoed the testimony of Detective Gish by stating the defendant "spread" the victim's vagina apart as captured in the image. The defendant also admitted Vandenburg told him to "spread" the victim's vagina, and he did so. The underlying evidence supporting the defendant's convictions did not rest solely on the images recovered from the defendant's cell phone. Rather, after viewing a video sent from Vandenburg's cell phone and an image obtained from Batey's cell phone, the defendant and McKenzie identified the defendant's sexual abuse of the victim, which included aggravated rape and aggravated sexual battery. Accordingly, nothing in the record suggests the images recovered from the defendant's cell phone contributed to the verdict returned by the jury, and the defendant is not entitled to relief as to this issue.

*II.    Sufficiency of the Evidence*

The defendant next challenges his conviction for aggravated rape.[10]   When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of

---

[10]The defendant does not challenge his conviction for aggravated sexual battery.

fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

As charged in the indictment, an aggravated rape "is unlawful sexual penetration of a victim by the defendant" when "the defendant is aided or abetted by one (1) or more other persons" and "knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless." Tenn. Code Ann. § 39-13-502(a)(3)(B). Sexual penetration includes "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7). "The occurrence of penetration, even though penetration is statutorily defined, is a question of fact." *State v. Bowles*, 52 S.W.3d 69, 74 (Tenn. 2001).

The defendant argues the State failed to provide evidence of penetration at trial. The defendant admits video evidence "of a water bottle placed in the butt cheeks of the victim" was introduced at trial, however, he asserts the video does not demonstrate penetration and the State failed to offer "testimony from the victim or any medical expert" to establish the same. The State asserts sufficient evidence exists to support the jury's finding of penetration, noting "[f]rom the angle and depth of the bottle, the jury could infer penetration." We agree with the State.

At trial, Captain Harville, Detective Gish, Detective Mayo, McKenzie, and the defendant testified the victim was unconscious upon entering Room 213. McKenzie and Mr. Prioleau testified the victim did not move or make any noise while she was on the floor of Room 213. The State presented a video recorded on Vandenburg's cell phone within minutes of entering the room, at approximately 2:40 a.m., which showed the defendant squeezing a water bottle after it had been inserted into the victim's anus. Along with the video, the State provided testimony from McKenzie and the defendant which acknowledged the defendant squeezed the water bottle as it was inserted in the victim's anus. Specifically, McKenzie testified the video showed the defendant squeeze a water bottle that was inserted into the victim's anus. Similarly, the defendant testified he squeezed the water bottle after it had been moved "in between [the victim's] butt

cheeks." The defendant argues the State failed to prove penetration because "there was no evidence introduced to establish that the bottle placed in the butt cheeks of the victim ever touched, much less penetrated, the anus of the victim." However, the jury resolved this issue in reaching its verdict. Regardless of the depth of the intrusion into the victim's anal opening, sufficient evidence exists in the record to support the jury's finding of penetration. Not only did the defendant admit to squeezing the water bottle as it protruded from the victim's anus, but the jury also watched the defendant do the same on video. A reasonable juror could find the defendant's act of squeezing the water bottle constituted an intrusion, "however slight," into the victim's anus, and the jury was permitted to infer from the images seen on the video and the testimony provided by McKenzie and the defendant whether a penetration occurred. The defendant is not entitled to relief.

## III.    *Evidentiary Rulings*

### a.  *Duress Defense*

The defendant challenges several evidentiary rulings related to the presentation of his defense of duress at trial. In support, the defendant sought to introduce testimony describing the abusive culture of the Vanderbilt University football team in both its general treatment of women and its specific treatment of the defendant in response to his rejection of the same. The State contends the trial court correctly ruled that this evidence was inadmissible, and we agree as our review of the record reveals none of the proffered evidence was critical to his defense or relevant to the defendant's trial.

A defendant has "the right to present a defense[,] which includes the right to present witnesses favorable to the defense," under both the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000) (citing *Taylor v. Illinois*, 484 U.S. 400, 408 (1988); *Washington v. Texas*, 388 U.S. 14, 23 (1976); *Chambers v. Mississippi*, 410 U.S. 284, 302; *State v. Sheline*, 955 S.W.2d 42, 47 (Tenn. 1997)). In presenting a defense, however, the defendant must still comply with the rules of procedure and evidence. *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007) (citing *Chambers*, 410 U.S. at 302). "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Id.* (internal citations omitted). "The facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence" and this Court must consider whether: "(1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the

evidence is substantially important." *Brown*, 29 S.W.3d at 434-35 (citing *Chambers*, 410 U.S. at 298-301)).

In order to establish duress as a defense, the defendant must demonstrate the following:

> Duress is a defense to prosecution where the person or a third person is threatened with harm that is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.

Tenn. Code Ann. § 39-11-504.

In support of his duress defense, the defendant proffered testimony from Ladarius Banks and Brian Kimbrow regarding the "hostile environment" the defendant was subjected to as a member of the Vanderbilt University football team. The defendant now asserts the trial court prohibited him "from developing the evidence to show a culture or environment of bullying and disrespect towards females" or from explaining the "bullying" he experienced and "outright targeting for violence on and off the field for any act of disloyalty or non-conformity." The defendant also proffered testimony about his decision to abstain from an "orgy incident" the night before the present crimes, which "resulted in [the defendant] being ridiculed by his teammates and co-defendants for not participating in this group sexual behavior." In limiting this line of testimony, the trial court determined the proffered evidence describing the culture of the football team and the prior "orgy incident" was not relevant to the duress defense, and we agree. The record makes clear none of the proffered testimony established facts which would support the defense of duress and as such, it cannot be considered critical to the defense.

Rather, the record indicates the duress defense was discounted by several witnesses at trial. Mr. Van der Wal and Mr. Prioleau testified team loyalty did not extend to criminal behavior. McKenzie stated throughout their crimes, the defendants were laughing and joking, he felt free to leave Room 213, and he did not hear anyone make any threats. Mr. Prioleau also did not hear any threats amongst the co-defendants during the abuse. Furthermore, McKenzie and the defendant removed themselves from Room 213 during the abuse when Batey urinated on the victim, and both refused to move the victim back to her car despite Vandenburg's request. Though the defendant testified he

feared being hurt "[e]ither that night or the next night or the next day," this testimony does not rise to the level of duress as nothing in the record indicates he was under an imminent threat of serious bodily injury or death. For example, when Batey urinated on the victim, the defendant left the room and refused to participate further absent any consequences from Batey or Vandenburg. Additionally, the defendant testified he twice refused Batey and Vandenburg's commands to touch the victim. Accordingly, the trial court did not abuse its discretion in limiting testimony concerning the culture of the football team and its impact on the defendant's decision to commit numerous sexual crimes against the victim. The defendant is not entitled to relief.

### b. *Narrative Testimony*

Finally, the defendant argues the trial court erred in allowing Detectives Gish and Mayo's "editorial commentary regarding the photos and videos introduced in this matter" in violation of the trial court's pre-trial order. The defendant also suggests the trial court erred by "not admonishing those witnesses when these violations occurred but instead allowing it to continue." The State contends the defendant "is not specific as to what commentary he believes harmed his defense" and argues "some measure of narration was essential to the jury's understanding" of the "assortment of images recovered by forensic examination of several different electronic devices." The State further asserts any alleged error was harmless as Detective Gish provided "permissible lay opinion" regarding the video which was corroborated by McKenzie, a witness to the crimes. Upon our review of this issue, we find no error.

The defendant does not question the admissibility of the images and video evidence, but rather Detectives Gish and Mayo's narration of the same. At trial, the defendant stipulated Detective Gish was an expert in "computer forensics analysis, mobile device analysis, as well as the analysis of those digital images and criminal investigations." After detailing the method by which he recovered the images and videos depicting the defendant's crimes, Detective Gish provided testimony describing what the images and videos appeared to show based upon his investigation into the same. Pursuant to Rule 702 of the Tennessee Rules of Evidence, this testimony was admissible. Tenn. R. Evid. 702 ("If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise."). Absent his qualifications as an expert, Detective Gish's testimony is also admissible as lay opinion testimony as he merely testified to his perception of what the images and videos showed after investigating the crimes committed against the victim. Tenn. R. Evid. 701 ("If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the

perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.").

The defendant, however, objected to Detective Gish's narration of the images and videos, and the trial court provided a limiting instruction to the jury: "Ladies and gentlemen, he is testifying what he believes it appears to be, but it's for your determination to determine what the picture actually shows. Okay?" At the conclusion of trial, the trial court further instructed:

> Merely because an expert witness has expressed an opinion does not mean, however, that you are bound to accept this opinion. The same as with any other witness, it is up to you to decide whether you believe this testimony and choose to rely upon it. Part of that decision will depend on your judgment about whether the witness's background or training and experience is sufficient for the witness to give the expert opinion that you heard. You must also decide whether the witnesses' opinions were based on sound reasons, judgment and information.

> You are to give the testimony of an expert witness such weight and value as you think it deserves along with all the other evidence in the case.

This Court presumes the jury followed the trial court's instructions. *State v. Joshua R. Starner*, No. M2014-01690-CCA-R3-CD, 2016 WL 1620778, at \*21 (Tenn. Crim. App. Apr. 20, 2016) (citing *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006); *State v. Shaw*, 37 S.W.3d 900, 904 (Tenn. 2001)). We also note both McKenzie and the defendant corroborated Detective Gish's testimony by providing similar descriptions and identifications of the images and videos presented throughout the trial. As such, the jury was permitted to consider Detective Gish's testimony concerning his investigation into and characterization of the images and videos as it is no different than a medical examiner testifying about his work in examining deceased bodies and the injuries a victim sustained as a result of a crime. The trial court did not abuse its discretion in allowing Detective Gish's narrative testimony and the defendant is not entitled to relief.

Regarding Detective Mayo, the defendant did not object to his "editorial commentary" at trial, so the issue has been waived on appeal. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). The defendant is not entitled to relief.

***Conclusion***

Based upon the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
J. ROSS DYER, JUDGE